O
JS-6

# United States District Court
# Central District of California

| | |
|---|---|
| JERIE S. RYDSTROM; DONALD RYDSTROM,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL INSURANCE COMPANY; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case № 2:16-cv-02543-ODW (E)<br>2:16-cv-02614-ODW (E)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [27] AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [26]** |

## I. INTRODUCTION

This insurance coverage dispute turns on the interpretation of two policy terms, "participants" and "management." Before the Court are Defendant Federal Insurance Company's motion for summary judgment and Plaintiffs Jerie and Donald Rydstrom's motion for partial summary judgment. (ECF Nos. 26–27.) For the following reasons, the Court **GRANTS** Defendant's motion and **DENIES** Plaintiffs' motion.

## II. FACTUAL BACKGROUND

Plaintiffs are the parents and beneficiaries/potential beneficiaries of insurance policies covering/potentially covering their deceased son Darren Rydstrom. (*See* Consol. Compl. ¶¶ 5, 14–18, 33–45, ECF No. 22.) Defendant is the insurer that underwrote those policies. (Resnick Decl., Exs. A, B, ECF No. 27.)

Darren was a director of photography and camera operator by trade, primarily in the reality television genre. (Johnson Decl., Ex. C, ECF No. 27.) On February 2, 2013, Darren formally agreed to be the director of photography for Bongo, LLC's[1] reality show "Lone Operator," which featured "Former Special Forces operators engag[ing] in a series of challenges on [a] . . . course to determine that they are capable of operating in a non-permissive urban environment with no outside support." (Resnick Decl., Ex. C at 104.) This agreement was memorialized in two related contracts: a loan out contract[2] and a Crew Deal Memo. (Johnson Decl., Exs. D, E.) For his services, Darren was paid $50 an hour, which worked out to $700 a day. (*Id.*, Ex. E at 226.)

Bongo had three insurance policies that functioned to protect it against adverse events arising from the production of "Lone Operator": a Special Risk Policy ("the AD&D policy"), a Guild Travel Accident Policy ("the Travel policy"), and a workers' compensation policy. (Resnick Decl., Exs. A, B; Johnson Decl., Ex. A.) The AD&D policy provided $1 million of accidental death coverage to "all participants in the production entitled 'Lone Operator.'" (Resnick Decl., Ex. B at 62–63.) The Travel policy provided accident coverage to three classes of persons: (1) employees associated with a guild; (2) employees not associated with a guild; and (3) all management employees. (*Id.*, Ex. A at 21.) The beneficiaries of Class 2 non-guild

---

[1] Bongo is a wholly owned subsidiary of parent company Eyeworks USA, LLC ("Eyeworks"). (Johnson Decl. ¶ 5.) For purposes of this decision, the Court refers to the entities collectively as "Bongo."

[2] Darren and his mother owned Trip 7 Media, LLC ("Trip 7"). This South Dakota limited liability company would "loan out" Darren's services and camera equipment to his employers. (Traylor Decl., Ex. A at 13, ECF No. 27.)

employees would receive $250,000 in the event of the non-guild employee's death and the beneficiaries of Class 3 management employees would receive $500,000 in the event of the management employee's death. (*Id.* at 22.)

On February 10, 2013, Darren was flying in a helicopter with Michael Donatelli, an "on camera personality" in "Lone Operator," when it crashed into a hillside killing its occupants. (Johnson Decl., Ex. F at 246; Consol. Compl. ¶ 11.) After the crash, Defendant deemed Darren a Class 2 non-guild employee under the Travel policy and paid Plaintiffs $250,000. (*See* Resnick Dep. 35:13–35:20, ECF No. 27; *see also* Pls. Opp'n 7 n.2, ECF No. 31.)

On February 5, 2016, Plaintiff Jerie Rydstrom filed a complaint in the California Superior Court for the County of Los Angeles alleging that she was owed $1 million dollars as a beneficiary under the AD&D policy because Darren was a "participant[] in the production of Lone Operator." (*See* Compl., ECF No. 1-1 (case ending in 2543).) On February 9, 2016, Plaintiff Donald Rydstrom also filed a complaint in the California Superior Court for the County of Los Angeles alleging the same. (*See* Compl., ECF No. 1 (case ending in 2614).) Defendant removed these cases on April 15 and April 13, 2016, respectively.

On July 5, 2016, the Court consolidated Donald Rydstrom's case with Jerie Rydstrom's case.[3] (ECF No. 13.) Approximately four months later, Plaintiffs filed a consolidated complaint. (ECF No. 22.) In the consolidated complaint, Plaintiffs seek not only to recover $1 million as beneficiaries under the AD&D policy but also an additional $250,000 under the Travel policy, claiming that Darren should have been deemed a management employee rather than a non-guild employee. (*See* Consol. Compl. ¶¶ 33–45.) The consolidated complaint contains eight causes of action: (1) breach of contract related to the AD&D policy; (2) tortious breach of the implied covenant of good faith and fair dealing related to the AD&D policy; (3) declaratory

---

[3] For this reason, the Court references only the docket associated with Jerie Rydstrom's case in adjudicating the instant motion.

relief related to the AD&D policy; (4) a common count related to the AD&D policy; (5) breach of contract related to the Travel policy; (6) tortious breach of the implied covenant of good faith and fair dealing related to the Travel policy; (7) declaratory relief related to the Travel policy; and (8) a common count related to the Travel policy. (*Id.* ¶¶ 14–60.)

On May 15, 2017, Defendant moved for summary judgment and Plaintiffs moved for partial summary judgment on causes of action one, three, five, and seven. (ECF Nos. 26–27.) Both motions are now fully briefed and ready for decision. (ECF Nos. 30–33.)[4]

### III. LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). A disputed fact is "material" where resolution of that fact might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). The dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When the moving party has carried its burden under Rule 56(c), the opposing party must show more than some metaphysical doubt as to the material facts; the nonmoving party must come forward with "*specific facts showing that there is a genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (emphasis in original) (citing Fed. Rule Civ. Proc. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*,

---

[4] After considering the papers submitted by the parties, the Court deemed these matters appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.

475 U.S. at 587 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

## IV. DISCUSSION

The parties disagree over whether "participants" and "management" are subject to more than one interpretation, and if the terms are subject to more than one interpretation, which interpretation controls.[5] As the previous sentence implies, California employs a multi-phase contract interpretation methodology in situations such as this. *See Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (2008).

In the first phase, the defendant submits extrinsic evidence to the court that points to a reasonable alternative interpretation of the relevant terms, distinct from the interpretation proposed by the plaintiff. *See id*. Once this evidence has been "provisionally receive[d]," the court conducts an examination of the evidence to determine whether the proposed alternative interpretation is reasonable. *Wolf*, 162 Cal. App. 4th at 1126; *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 393 (2006) ("When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party." (quoting *Southern Cal. Edison Co. v. Superior Court*, 37 Cal. App. 4th 839, 847 (1995)).

If the court finds the defendant's proposed alternative interpretation reasonable, then it progresses to the second phase. In the second phase, the court admits the defendant's previously submitted evidence and examines it, along with any extrinsic evidence supplied by the plaintiff, to determine which of the proposed interpretations reflects the parties' intent at the time of contracting. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1015 (9th Cir. 2012) ("'If the court decides, after consideration of this evidence, that the language of a contract, in the light of all the circumstances, is fairly susceptible of either one of the two interpretations contended for, extrinsic

---

[5] Neither of the terms are defined in the policies themselves.

evidence relevant to prove either of such meanings is admissible.'" (quoting *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 989 (9th Cir. 2006)); *see also id.* ("Under California law, [t]he fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed *at the time of contracting*." (emphasis added)); *Supervalu, Inc. v. Wexford Underwriting Managers, Inc.*, 175 Cal. App. 4th 64, 73 (2009) (explaining that if the relevant "language is 'reasonably susceptible' to the interpretation urged" in the first step, the "extrinsic evidence" used in the first step "is then admitted to aid the second step—interpreting the contract." (quoting *Gen. Motors Corp. v. Superior Court*, 12 Cal. App. 4th 435, 441 (1993)). When there is no conflict of "extrinsic evidence," the court may decide as a matter of law which of the proposed interpretations reflects the parties' intent at the time of contracting.[6] *Wolf*, 162 Cal. App. 4th at 1126.

**A. Participants**

The essence of Plaintiffs' argument is that "all participants in the production of Lone Operator" should be interpreted in the most literal sense to mean *every* person involved in the production of "Lone Operator" from the lowliest production assistant to the producer himself. (*See* Pls. Mot. 10, ECF No. 26-1 ("Federal's 'Special Risk' policy unambiguously provides a $1 million death benefit for 'All participants in the production entitled Lone Operator'—not a few and not the anointed participants, but ***all*** of them. The analysis should stop there . . ." (emphasis in original)). Defendant

---

[6] Plaintiffs argue that California Insurance Code section 10113, California Code of Civil Procedure section 1856, and California Civil Code 1625 prohibit the Court from considering extrinsic evidence to interpret the two contracts at issue. (*See*, *e.g.*, Pls. Opp'n 1; *see also* Pls. Objections to Evidence, ECF No. 31-5.)) These statutes are inapposite. California Insurance Code section 10113 prohibits use of incorporation by reference in insurance contracts, an issue not present here. California Code of Civil Procedure section 1856 limits the use of parol evidence but contains an explicit exception allowing for the use of such evidence to "interpret the terms of [an] agreement," the task the Court is faced with here. The statute also provides an explicit exception for parol evidence of the parties' "course of dealing." Cal. Code. Civ. P. § 1856. Finally, California Civil Code 1625 indicates that an "executed contract" "in writing" supersedes any version made during negotiations. Defendant is not arguing that a prior version of the contract made during negotiations controls here, it is arguing about what the terms of the "executed" contract mean.

1 argues that the breadth of this interpretation far exceeds the parties' intent at the time
2 of contracting. Defendant argues that the contracting parties intended[7] for
3 "participants" to be interpreted as persons in front of the camera. (Def. Mot. 14, 17–
4 18, ECF No. 27-1.)

**1. Whether Defendant's Alternative Interpretation is Reasonable**

After reviewing the record, the Court finds that Defendant's alternative interpretation is reasonable.

    **a. Both Contracting Parties Explicitly Agree With Defendant's Interpretation**

Defendant presents the declaration and deposition testimony of Matthew Johnson, Bongo's Senior Vice President for Production, and Alan Resnick, Defendant's underwriter, to demonstrate that the two parties' representatives tasked with negotiation and execution of the AD&D policy expressly intended for "participants" to mean persons in front of the camera. This type of extrinsic evidence is permissible to assist in the interpretation process. *See Miller*, 454 F.3d at 990 ("Extrinsic evidence includes testimony regarding the circumstances in which a contract was written . . ."); *Trident Ctr. v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir. 1988) (recognizing that courts may need to divine the parties' intent from "self-serving testimony offered by partisan witnesses whose recollection is hazy from passage of time and colored by their conflicting interests.")

Johnson indicates in his declaration that "In seeking AD&D/AME coverage for the 'Lone Operator' production Eyeworks/Bongo intended to insure and only paid to insure solely . . . ex Special Forces individuals as 'participants' in the 'Lone Operator'

---

[7] Plaintiffs argue that Darren's intent is also relevant citing *Insurance Company of North America v. Bechtel*, 36 Cal. App. 3d 310, 317 (1973). (Pls. Mot. 8, 10.) This is absurd, as Darren was not involved with negotiating the policies at issue—there is no evidence that he even knew of their existence. *Bechtel* is not relevant here. The legal issues in *Bechtel* are materially different from the ones in this case; *Bechtel* dealt primarily with mutual mistake. 36 Cal. App. 3d at 316. The facts in *Bechtel* are also very different, the employee in that case knew there was an insurance contract between his employer and an insurer affecting him (he was issued an insurance certificate), making it much more reasonable that his intent might be considered. *Id.* at 318.

production. In seeking AD&D/AME coverage for the 'Lone Operator' production, Eyeworks/Bongo did <u>not</u> intend to insure any of the production crew for 'Lone Operator.' Eyeworks/Bongo did not intend to provide coverage for Mr. Rydstrom under the Federal AD&D/AME policy." (Johnson Decl. ¶ 28 (emphasis in original).) Johnson made a similar statement during his deposition: "The AD&D/AME is—I've only ever bound it for on-camera talent and in this case, that was the same." (Johnson Dep. 25:16–25:18, ECF No. 27.)

Defendant's underwriter had the same understanding. Resnick indicates in his declaration that he has:

> never issued an AD&D policy to Bongo/Eyeworks, or any other policy holder in which the term 'participants' was intended to encompass persons other than those who were in front of the camera. The term 'participants' was not intended to include, encompass or provide coverage for the production crew, even if an individual was in charge of a department, and regardless of their job title or responsibilities.

(Resnick Decl. ¶ 13; *see also id.* ¶ 29 ("we always intended and understood 'participants' to mean certain actors . . . 'participants' did not mean everyone involved with the production.").) These statements show that both contracting parties actually believe/believed the policy only provides coverage to persons appearing in front of the camera.

### b. The Contracting Parties' Conduct Also Demonstrates That They Believed "Participants" Referred to Persons in Front of the Camera

The contracting parties' conduct also demonstrates that they believed "participants" referred only to persons in front of the camera. Certain evidence in the record directly equates "participants" with persons in front of the camera. For instance, in one email conversation regarding add-on coverage for a sky dive, Britney Hearns, the insurance broker operating on behalf of Bongo's Johnson, informs Resnick that: "Two participants will be sky diving. They each are diving once on their own and are extremely experienced divers (they are both ex Special Forces)."

(*Id.*, Ex J at 119.) In Hearns' email, "participants" is used to describe ex Special Forces operators, the on-camera subjects of the show. Resnick then replied, confirming that the ex Special Forces operators are indeed "participants" within the meaning of the AD&D policy: "To provide coverage for this jump will be $1,500 additional premium for both people total, $750 each. Keep in mind that we have a $1,000,000 death benefit *on these participants*."[8] (*Id.*, Ex. M at 130 (emphasis added)); *see also Miller*, 454 F.3d at 990 (explaining that the parties' subsequent conduct is relevant to prove what terms in the executed contract mean); *Employers Reinsurance Co. v. Superior Court*, 161 Cal. App. 4th 906, 921 (2008) ("The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions." (quoting *Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1189 (1987)).

Additional evidence supports the proposition that "participants" refers to persons in front of the camera, but it requires an intervening logical step: that "participants" refers to "talent" and "talent" refers to persons in front of the camera. The Court begins by examining the link between "participants" and "talent." On November 1, 2012, Bongo's Johnson requested two quotations for AD&D coverage, one from Defendant and one from insurance broker MIB in order to compare their prices. (Johnson Decl., Ex. K at 268, Ex. L at 271.) In an email to Hearns, Johnson requested an AD&D quote for "4 participants" for "30 shoot days." (Johnson Decl., Ex. K at 268.) In an email sent two minutes later to MIB, Johnson requested an AD&D quote for "4 people[,] all talent[,] 30 days." (Johnson Decl., Ex. L at 271.)[9]

---

[8] The AD&D policy provides a $1 million death benefit for each participant. (Resnick Decl., Ex. B at 63.)

[9] Emails in the record make clear that the two quotations were obtained for the purpose of comparison with an eye towards driving down the cost of coverage. (*See* Johnson Decl., Ex. K at 269.) To make this comparison work, the quotes necessarily had to be for coverage of the same group of persons. Johnson's declaration confirms this understanding. (*Id.* ¶ 27 ("This was the exact same information I communicated to Federal . . .").)

Thus, it appears Johnson believed around the time of contracting that "participants" and "talent" were interchangeable.

Defendant's conduct demonstrates the same belief. On November 2, 2012, Defendant provided the aforementioned quote based on "4 participants." (Resnick Decl., Ex. C at 103.) In the next quote, days later on November 5, 2012, "4 participants" was replaced with "4 Insureds (Talent)." (*Id.*, Ex. D at 106.) This was ultimately the version that Bongo agreed to on December 5, 2012. (*Id.*, Ex. E at 108.) After receiving Plaintiffs' assent to the policy including the "4 Insureds (Talent)" language, Defendant once again used "participants" when it issued the formal AD&D policy. (*Id.*, Ex. B at 62.) Thus, both parties appear to have used and accepted "participants" and "talent" as interchangeable.

With this understanding in mind, the Court turns its attention to the link between "talent" and persons in front of the camera. The most compelling evidence that these concepts are synonymous is that persons appearing in front of the camera signed Talent Agreements, while those not appearing in front of the camera signed Crew Deal Memos. For instance, Michael Donatelli, an "on camera personality," signed a Talent Agreement while Darren signed a Crew Deal Memo. (*Compare* Johnson Decl., Ex. E, *with id.*, Ex. F.) The other cast members appearing on screen also signed Talent Agreements. (*See id.*, Ex. G at 259 (noting that "talent deals" were out for signature with a number of persons known to be appearing in front of the camera); *see also* Johnson Dep. 22:3–22:12 (explaining that the persons with whom the talent agreements were out for signature were persons appearing in front of the camera).)

Defendant also presents evidence of pattern and practice in the industry and in the parties' prior dealings, which suggests that sophisticated parties, such as those contracting for the AD&D policy here, would have used "talent" to mean persons in front of the camera. (*See* Traylor Decl., Ex D at 40 (Resnick at his deposition "In the normal course of my business, when I say 'talent,' I am referring to on camera. I

don't know anyone who refers to 'talent' in my business who is referring to anyone else."); Ex. C at 31 (Johnson at his deposition essentially stating the same)); Resnick Decl. ¶ 12 ("Talent in both my custom and practice, and in particular my workings with this policy holder and its broker, always meant those persons appearing in front of the camera only.")[10]; *see also Worthington Const., Inc. v. L.A. Contractors Corp.*, No. G032063, 2004 WL 2677088, at *7–8 (Cal. Ct. App. Nov. 24, 2004 (noting that extrinsic evidence of trade usage is relevant and admissible to interpret contract terms (citing *Hayter Trucking, Inc. v. Shell Western E & P*, 18 Cal. App. 4th 1, 17 (1993)); *Ermolieff v. R.K.O. Radio Pictures*, 19 Cal. 2d 543, 550 (1942) (indicating that "[trade] usage becomes a part of the contract in aid of its correct interpretation").[11]

Based on the evidence discussed in the two prior subsections, the Court finds Defendant's alternative interpretation reasonable. As such, the Court turns to the question of whether Plaintiffs' or Defendant's interpretation should control.

### 2. Which of the Two Interpretations Controls

The Court finds that Defendant's interpretation expresses the parties' intended meaning of "participants" at the time of contracting. Plaintiffs' evidence and arguments in favor of their interpretation and rebuttal of Defendant's interpretation are not sufficient to avoid summary judgment.

---

[10] Plaintiffs argue that Resnick and Johnson are not qualified to offer custom and practice evidence. The Court disagrees. While Resnick and Johnson could have laid out their experience more clearly and more exhaustively in their declarations, their declarations make clear that both have extensive experience in their respective industries. Resnick is an underwriter, has worked sixteen years for Defendant, and has experience with at least some "similar policies." (Resnick Decl. ¶¶ 2, 7.) Johnson has been an entertainment executive in production for at least five years, a portion of that time in a Senior Vice President of Production role. (Johnson Decl. ¶ 4.) Further, Plaintiffs deposed the two declarants and had an opportunity to question them about the depth and range of their experience. Even if the evidence of custom and practice offered were for some reason deemed inadmissible, the two declarant's personal experience with the parties and types of contracts at issue would still carry weight.

[11] Conspicuously absent is any rebuttal evidence from Plaintiffs asserting that pattern and practice in the relevant industry is different than Defendant suggests or that the parties did not use "talent" in their prior dealings as Defendant suggests.

Plaintiffs begin by pointing to a single sentence in the Crew Deal Memo that they believe supports a broader definition of "participants" than persons appearing in front of the camera:

> In the event Producer is prevented from or materially hampered in obtaining the materials, labor or facilities necessary for filming . . . by reason of any local, municipal, state or United States law or ordinance . . . or by . . . illness or incapacity of any key crew members and/or participants appearing in the series ["Participants"].

(Johnson Decl., Ex. E at 229.) Plaintiffs argue that "participants" in this sentence is used as shorthand for key crew members and those appearing in front of the camera. (Pls. Reply 8, ECF No. 33.) The Court disagrees with Plaintiffs' proposed reading of the sentence. In the context of the sentence as a whole, the summarizing parenthetical refers only to the final phrase of the sentence after the and/or, to "participants appearing in the series." Indeed, if anything, the sentence tends to support Defendant's interpretation—anyone "appearing in the series" suggests "participants" are persons "appearing" in front of the camera.

Plaintiffs next argue that the Court should adopt its broad interpretation of "participants" because the number of persons falling within Defendant's interpretation of "participants" could have been four or five.[12] (*See* Pls. Reply 4.) Again, however, Plaintiffs' argument misses the mark. To begin, the contracting parties clearly intended for the agreement to cover four insureds. (Resnick Decl. Ex. E at 108 (Bongo binding coverage for "4 insureds").) Further, even if the number of persons was unclear, the difference between four and five persons is insignificant. Blanket insurance, like the AD&D policy at issue here, specifically allows for coverage of an

---

[12] Plaintiffs also argue that there were seven persons falling within the class at one point. (Mot. 4; Reply 4.) In making this argument, Plaintiffs point to the first page of a call sheet that lists seven names under the heading "Cast." (Crook Decl., Ex. G at 119.) However, Defendant has presented the second page of the same call sheet, which shows that there were at most five persons to be filmed that day, and that all five were not being filmed at the same time. (Def. Objections to Evidence, Ex. A at 6, ECF No. 30-1); *see also* Fed. R. Evid. 106 (where one party submits an incomplete document, the other party may submit "another part" of the same document for clarification in response).

unknown, amorphous class of persons so long as those persons all fit within a defined class. (*See* Resnick Dep. 47:1–47:25 (explaining that even if a different number of persons fell within the class than originally priced into the policy, Defendant would be obligated to pay all those falling within the class in the event of an accident)); *see also* State of California Assembly Bill 2084, September 14, 2012, Blanket Insurance (noting blanket insurance is meant to cover groups of persons "not specifically known to the organization in advance, or, if known, [where] the identities of the participants are constantly changing within the class of people participating in the [same] activities").[13] There can be no doubt that regardless of whether there were four or five persons, they all fell within the class of persons appearing in front of the camera. Thus, Plaintiffs' argument fails.

Finally, Plaintiffs argue that even if Defendant's interpretation of "participants" to mean "talent" is correct, Darren was talent. Plaintiffs cite an entertainment law treatise glossary for the following definition of "talent": "individuals involved in the creative process, including musicians, actors, writers, directors, cinematographers, and set designers." (Crooke Decl., Ex. J at 132, ECF No. 26-2); Selz et al., *Entertainment Law: Legal Concepts and Business Practices* (3d ed. 2015). Yet again, however, Plaintiffs' argument falls flat. First, this generalized definition of talent is clearly too broad to fit the usage of talent relevant here—for instance, this definition extends to musicians, persons in an entirely different part of the entertainment industry. Second, generalized definitions of terms such as this cannot, by themselves, be used to overcome evidence of specialized meaning given to terms by the parties. *See* Cal. Civ. Code § 1644 ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or *unless a special meaning is given to them by usage, in which case the latter **must be followed**"* (emphasis added)); *Pac. Gas & Elec. Co. v.*

---

[13] Defendant requests that the Court take judicial notice of this bill. (*See* ECF No. 27-3.) As Plaintiffs do not oppose Defendant's request and the bill is a publically available state government document not subject to reasonable dispute, the Court grants Defendant's request.

*G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 38 (1968) (noting that terms do not have a "fixed" or "objective" meaning and must be interpreted in light of the specific circumstances and purposes of the parties in the particular contract at issue); *Blasiar, Inc. v. Fireman's Fund Ins. Co.*, 76 Cal. App. 4th 748, 753–54 (1999) (explaining that because "no party offered any extrinsic evidence," the contract should be "interpreted according to the common and ordinary meaning"); *Sony Computer Entm't Am. Inc. v. Am. Home Assur. Co.*, 532 F.3d 1007, 1013 (9th Cir. 2008) (noting that dictionary definitions must be considered in context with the particular policy at issue). As described at length above, the parties intended for the term "participants" to have special meaning.[14]

After considering the undisputed evidence, the Court finds that Defendant has shown that its interpretation of "participants" was the one the parties intended at the time of contracting. Having found that the correct interpretation of "participants" is persons appearing in front of the camera, the Court finds that Darren, a person behind the camera, is not covered by the AD&D policy. As such, Defendant did not breach the AD&D policy by withholding payment from Plaintiffs and cannot be held liable for tortious breach of the implied covenant of good faith related to that policy. *Fortaleza v. PNC Fin. Servs. Group, Inc.*, 642 F. Supp. 2d 1012, 1021–22 (N.D. Cal. 2009) ("To establish a breach of an implied covenant of good faith and fair dealing, a plaintiff must establish the existence of a contractual obligation . . ."). Likewise, Plaintiffs are not entitled to declaratory relief and are not owed money by Defendant under the AD&D policy. As such, the Court **GRANTS** Defendant's motion for summary judgment as to causes of action one through four and **DENIES** Plaintiffs' motion for partial summary judgment as to causes of action one and three.

---

[14] Plaintiffs also attempt to cobble together a definition of "talent" using a combination of logic and the two subsections of California Labor Code § 1700.4. While the Court applauds Plaintiffs' creativity, the definition of a term within a particular statute has little relevance to the definition of a term in a particular contract where, as here, the parties did not express any desire for the term to be interpreted in light of the statute and the statute does not govern the specific contract at issue.

**B. Management**

As with "participants," Plaintiffs argue that the Court should interpret "management" in accord with its plain and ordinary meaning as any person with "management responsibilities." (Pls. Mot. 13.) In contrast, Defendant argues that "management" refers to a specific group of twelve full-time, permanent employees working at Bongo's corporate level. (Def. Mot. 21–22.)

**1. Whether Defendant's Alternative Interpretation is Reasonable**

As in the "participants" section above, the Court finds that Defendant's alternative interpretation is reasonable.

### a. The Evidence Suggests That "Management" Pertains Only to Twelve Full-Time, Permanent Employees Working at Bongo's Corporate Level

Significant evidence supports Defendant's proposed interpretation. To begin, the two contracting parties' representatives, Resnick and Johnson, have each submitted declarations indicating that they intended Class 3 of the Travel policy to cover a group of twelve, full-time, permanent employees working at Bongo's corporate level, not Darren or persons similarly situated to Darren. (*See* Resnick Decl. ¶ 34 (indicating that Class 3 pertains to "permanent management employees of the policyholder"), 41–42; *see also* Johnson Decl. ¶¶ 34–36 (noting that "management" was intended to reference "Eyeworks' full time professionals" not "temporary employees" or "production crew").) Defendant further indicates that it purchased a workers' compensation policy to cover crew rather than covering them under Class 3 of this policy or the AD&D policy. (Johnson Decl. ¶ 37.)

Further, as Defendant highlights, the evidence makes clear that the Travel policy was a part of its broader "corporate insurance" intended to cover all of Bongo's productions (shows, projects, etc.) over a one-year period. Traylor Decl., Ex. F at 53 (Hearns noting this at her deposition); Resnick Decl. ¶ 37 (same); Resnick Decl., Ex. P (reaffirming this understanding to Hearns after being asked for clarification);

1  Johnson Decl. ¶ 32. Therefore, it does not make sense that the term "management" would refer to a person with management responsibilities in only one of Bongo's many productions, such as "Lone Operator."

Additionally, emails between Resnick and Hearns show that the group of twelve persons deemed to be "management" included at least two of Bongo's corporate officers. (Resnick Decl., Ex. Q at 141.) This suggests that any person falling under the "management" heading would have to be sufficiently high up on Bongo's corporate ladder to warrant consolidation under the same heading as corporate officers. Previous iterations of the Travel policy also support the conclusion that "management" was meant to reference persons high up on Bongo's corporate ladder. (Resnick Decl. ¶ 39.) These iterations substituted "executives" for "management." (*Id.*) Resnick intended for "management" to be consistent with the "previous [year's] . . . use of executives" when he wrote the relevant policy. (*Id.*)

After reviewing the record, the Court finds Defendant's proposed interpretation of "management" reasonable. As in the "participants" section, the Court next turns to which of the two proposed interpretations should control.

**2. Which of the Two Interpretations Controls**

The Court again finds that Defendant's interpretation expresses the parties' intended meaning at the time of contracting. Plaintiffs have not offered any significant extrinsic evidence to rebut the evidence Defendant offers in support of its interpretation. Instead, Plaintiffs offer regulatory and dictionary definitions of "management" without regard for how the parties specifically intended to use the term in this particular agreement, in other words whether the term had "special meaning."

First, Plaintiffs point to a definition of management in 29 C.F.R. § 541.102. (Pls. Mot. 13–14; Pls. Opp'n 11.) Section 541 provides for certain exceptions to federal wage and hour laws for "executive, administrative, or professional" employees. Section 541.100 provides the requirements to be deemed an exempt executive employee. Among other requirements, an executive employee's "primary

1 duty" must be "management of the enterprise in which the employee is employed or
2 of a customarily recognized department or subdivision thereof." 29 C.F.R.
3 § 541.100(a)(1)(2). Section 541.102 provides a definition of management for the
4 purposes of evaluating whether the employee in question meets the requirement in
5 subsection 541.100(a)(1)(2). Plaintiffs have not explained how a definition of
6 "management" used to determine whether a person is an exempt executive employee
7 is relevant to the whether an employee was "management" within the context of the
8 travel insurance policy at issue. Therefore, while regulatory definitions can be useful
9 in some instances to assist in the interpretation of a contract, *see*, *e.g.*, *Garamendi v.*
10 *Golden Eagle Insurance Co.*, 127 Cal. App. 4th 480, 486 (2005), the Court gives little
11 to no weight to the regulatory definition of "management" offered here.[15]

12 Plaintiffs next point to a Merriam Webster Dictionary definition of "manage":
13 "1: Handle, control: to ***direct*** or carry on business or affairs . . ." (emphasis supplied).
14 (Pls. Opp'n 23 (emphasis in original).) Plaintiffs argue that because the definition
15 contains "to direct" and Darren was a "director of photography" "[t]his makes him a
16 Class 3 insured. (*Id.*) This analysis amounts to a gross oversimplification and relies
17 on the use of false equivalents. Further, as the Court indicated in the "participants"
18 section above, evidence of plain and ordinary meaning will not function to overcome
19 specialized meaning given to terms by the parties.

20 Even if the Court were willing to consider some colloquial definition of
21 management, Darren was clearly not management, even within the context of the
22 "Lone Operator" production. While he may have overseen the work of five persons in
23 the camera department, he did not make hiring decisions or exercise creative control
24 over the show. (Johnson Decl. ¶ 31 (acknowledging that Darren was "in charge of the
25 camera department for 'Lone Operator'); *but see id.* ¶ 22 (noting that Darren did not
26 exercise creative control); Ex. E at 230 (Crew Deal Memo explaining that "As

---

[15] As Defendant further points out, subsection 541.100 would not apply in any way to Darren because he was hired as an hourly employee. The first consideration in determining whether an employee is "executive" is whether they are salaried. 29 C.F.R. § 541.100(a)(1).

between the employee [Darren] and Producer, Producer will have full control and final approval over any and all business, financial, creative, artistic, and other elements in connection with the Series."); Johnson Dep. 38:17–38:20, ECF No. 31-2 (indicating that while the director of photography may be in charge of the camera department he must "answer[] to the director and executive producer and execut[e] what their vision is"); Crooke Decl. Ex. M at 197 (demonstrating that although Darren made recommendations about potential crew for the camera department, these recommendations were subject to review and approval before offers were extended).

      The Court has considered both sides' proposed interpretations and all of the supporting evidence and finds that Defendant's interpretation represents the parties' intent at the time of contracting. Applying Defendant's proposed definition, it is clear that Darren is not "management." Darren was an employee on loan from another company, Trip 7, who received an hourly wage and worked on a production-by-production basis; he was not a permanent, full-time corporate employee of Bongo working across various Bongo productions. (Johnson Decl. ¶ 11 (personally knew Darren to be a "freelance" director of photography and camera operator "retained on a production-by-production basis"), 17 (indicating that Darren was an hourly employee), 25 (affirming that Darren never held a management position or was a management employee of Bongo and/or Eyeworks); Ex. A at 81 (California Labor Code Section 2810.5, indicating that Darren was a nonexempt employee paid on an hourly basis), 83 (non-union form showing that Darren was an hourly employee); Ex. C (Darren's resume showing that he was a freelance director of photography/camera operator and had worked on many different projects for many different employers); Crooke Decl. Ex. O (paystubs showing hourly-wage calculations). As such, Defendant did not breach the Travel policy by withholding an additional $250,000 payment from Plaintiffs and cannot be held liable for tortious breach of the implied covenant of good faith related to that policy. *See Fortaleza*, 642 F. Supp. 2d at 1021–22. Likewise, Plaintiffs are not entitled to declaratory relief and are not owed money

by Defendant related to the Travel policy.  As such, the Court **GRANTS** Defendant's motion for summary judgment as to causes of action one through four and **DENIES** Plaintiffs' motion for partial summary judgment as to causes of action five and seven.

## V. CONCLUSION

This Court deeply sympathizes with Plaintiffs who lost their son in a tragic aviation accident.  However, this sympathy does not change the fact that "the record taken as a whole could not lead a rational trier of fact" to find for Plaintiffs in this insurance coverage dispute.  *See Matsushita*, 475 U.S. at 587.  Accordingly, the Court **GRANTS** Defendant's motion for summary judgment (ECF No. 27) and **DENIES** Plaintiffs' motion for partial summary judgment (ECF No. 26).  Additionally, the Court seals the record (ECF Nos. 26–33) to protect Darren's personal information.  The Clerk of Court shall close the cases.

**IT IS SO ORDERED.**

July 7, 2017

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**